MORGAN, Appellant, v. MORGAN, Respondent.

St. Louis Court of Appeals, November 17, 1908.

DIVORCE: Indignities: Discretion of Court. Where the evidence
in an action for divorce showed that the husband was guilty
of frequent and unreasonable outbursts of passion without pro-
vocation, that he was unwilling to work or support his wife and
abandoned her, she was entitled to a divorce and her right
did not rest in the discretion of the court.

Appeal from St. Louis City Circuit Court.—*Hon. Wm.
M. Kinsey,* Judge.

REVERSED AND REMANDED (*with directions*).

*A. A. Paxson* for appellant.

BLAND, P. J.—The action is for divorce. The
petition alleges that plaintiff and defendant were mar-
ried at the city of St. Louis, on August 30, 1905, and
continued to live together thereafter until January 8,
1908, when defendant left plaintiff saying he could not
support her. After alleging that plaintiff at all times
treated defendant with kindness and affection and dis-
charged all her marital duties, the petition alleges:

"That defendant is possessed of a violent temper
and jealous disposition and very much prefers an easy,
idle life to one of activity. That in consequence thereof
the defendant has wholly failed to properly support
plaintiff during their entire married life. That from
September 17, 1906, until February 11, 1907, the de-
fendant left plaintiff and lived apart from her because
of his inability to support plaintiff, and that after he
returned to plaintiff on account of his idle and unbusi-
nesslike habits, carelessness and indifference, failed to
support plaintiff properly, so that she was compelled
to obtain means from her relatives. That in the month
of June, 1907, the defendant sent for his child by a

former marriage for the purpose of visiting for two weeks, and when plaintiff requested of defendant some money with which to entertain his child and her attendant defendant refused to comply with said request. That frequently during their married life, and more especially during the last year of same, defendant when angry would fly into a rage and would throw himself on the floor and cry out and beat it with his head, hands and feet.

"That about December 15, 1907, on a Sunday, the defendant grasped the plaintiff's throat with both hands and choked her and said that he would get a gun and blow plaintiff's brains out, and would then blow his own out.

"That in October, 1907, when plaintiff informed defendant that she was going to an entertainment, the defendant conducted himself in the most violent manner, by striking the table violently with his fist, throwing himself on the floor and beating it with his head, hands and feet. That in the same month of October, 1907, the defendant took a butcher knife and flourished it about plaintiff's and defendant's heads, and said that he might as well end both their lives as he could not support plaintiff and would not let anybody else have her.

"That on December 26, 1907, the defendant assaulted plaintiff with his hands in a most violent manner. That on numerous occasions the defendant has, without cause, quarreled with plaintiff, and been guilty of loud and unseemly conduct, so as to attract the attention of others. That the defendant has never adequately supported plaintiff, nor made proper efforts to do so, although he was in good health and quite able to work if so inclined."

Defendant was personally served with process of summons to appear at the February term, 1908, to answer the complaint of plaintiff. He made default

134 App—11

and a default judgment was rendered against him and the cause continued to the ninth day of the succeeding month.   On March ninth, defendant still being in default, plaintiff's evidence was heard by the court, at the conclusion of which the court dismissed the cause.   A motion for new trial proving of no avail, plaintiff appealed.

Plaintiff's evidence shows that defendant was of a jealous disposition and possessed of a violent temper, and failed to support his wife, though he was a healthy and able-bodied man; that from September 17, 1906, to February 11, 1907, defendant absented himself from plaintiff, without cause or excuse, and failed to contribute anything to her support and that she had to rely on her people for maintenance.

Plaintiff testified as follows:

"On Sunday, December 15th, I was sitting and reading and Mr. Morgan came in and asked if I wanted him to leave me and when I did not answer him he grasped me around the throat and almost choked me, and after I had freed myself he said he was going to get a gun and blow my brains out and then blow his own out.   The people downstairs heard him.   He grabbed me around the throat with his hands—almost choked me, and I had to struggle to free myself from him.   We had had no difficulty that day at all, he just came up and asked if I wanted him to leave me, and he owed considerable money and had received a number of letters from his creditors the day before, and I think that upset him considerably.

"In October, 1907, a Miss Green, whom I had known all my life, invited me to go to the matinee with her; defendant had no objection to her, but said he didn't want me to go, to break the engagement, and when I said I couldn't he beat his hands and face and kicked over a few chairs, and beat the floor with his head, hands and feet.   In that same month I asked defendant to let me have some money to get some grocer-

ies with, and he took a butcher knife and flashed it above our heads and said he might as well end both our lives, as he couldn't support me, and wouldn't let anyone else have me. He did that in such a way that I feared him. I feared him very much since that Sunday he threatened to blow my brains out. In October he was very threatening about that. In December he threatened to blow my brains out.

"Judge Paxson: . . . On the twenty-sixth of December, what occurred? A. Mr. Morgan wanted me to arrange for a New Year's dinner and I told him we could not afford to do that, and then he grasped me very violently by the shoulders and insisted on my doing it, but we couldn't do it as we hadn't the money and so couldn't give the dinner. He wanted to entertain friends—my people and some friends.

"He was and is an able-bodied man, able to work if he were willing; his health has been exceptionally good while we were married; he never complained of anything as to his health

"On January 8, 1908, Mr. Morgan came to me and said he couldn't support me and he was going away; and he telephoned for an express wagon and assisted the man to put his trunk upon the wagon and then came upstairs and said good-bye, and that he wasn't man enough to take care of me, and I said good-bye.

"Q. Has he ever been back since? A. He came one Sunday evening.

"The Court: You say he came to see you? A. Yes, sir; one Sunday evening he came to the door and knocked on the door and rang the bell.

"Q. You knew he was there and wouldn't attend to it? A. No, I was afraid of him. I had been afraid of him ever since that Sunday he threatened to shoot me.

"The Court: You were not afraid of him, were you? A. I certainly was. So much so that I had to take medicine for my nerves ever since that Sunday; Dr. Guhman is my physician. My maiden name was Deters.

All these offenses were committed by defendant in St. Louis, and I am now really afraid that defendant will carry out that threat. I certainly am very much afraid of it."

Mrs. Kate Deters, plaintiff's mother, testified as follows:

"I visited my daughter on St. Louis avenue and frequently since she has been living in my flat. Plaintiff properly attended to her duties as a housewife; was a nice, tidy housekeeper. She attended to her household the way she ought to do and was very saving. I frequently saw plaintiff and defendant together. She treated him kindly and affectionately as a wife ought to do, and she treated his child the same way while it was with her. His disposition was very disagreeable; he showed very bad temper and a jealous disposition, and whenever anybody talked to her—my son or my niece or anybody in the house—he was so jealous he couldn't see. He showed ugly ways about it by cutting a person short; he would cut you short when you talked to him. I frequently heard him when he threw himself on the floor and pounded the floor and furniture. Often has my daughter come downstairs to me just after I heard him making those noises and she was nervous and crying. He would make an awful noise like somebody would throw something down on the floor, turn over the chairs and things like that, and you could hear his voice all the time. I could tell that it was his voice, and she was usually crying whenever he would make such a noise. She is still living there and I have to support her. My husband is in the grocery business on Sutherland avenue. My daughter associates with proper people and her character is good."

Harry Mesker, a witness for plaintiff, testified as follows:

"I knew Mr. Morgan. I took care of the premises. My attention has frequently been attracted by these unusual noises in Mr. Morgan's house, like something

falling upstairs, and I would go up and see if anything happened and I could generally hear Mr. Morgan's voice quarreling. The noise was made by throwing over chairs and pushing the table around and all of a sudden heard a dead fall. I couldn't help hearing. On three or four occasions I paid particular attention to it and could tell from the noise that it was Mr. Morgan's voice. I am in no way related to the parties."

Joseph Laudauer testified as follows:

"I have known plaintiff from childhood. I do not know her husband. I know plaintiff's general reputation among those with whom she associates and it is just as good as it can be."

That this evidence shows defendant was guilty of cruelty and intolerable indignities toward his wife, admits of no doubt; it also shows that this conduct began a few months after their marriage and grew worse until defendant abandoned his wife; it further shows defendant's frequent and unreasonable outbursts of passion were without provocation; that on account of his laziness he was unwilling to work to support his wife, and for this reason, and no other, he abandoned her. We think plaintiff's evidence shows she is entitled to the relief prayed for. Her right to a divorce did not rest in the discretion of the court, but is a statutory right which the court was bound to enforce. [Grenzebach v. Grenzebach, 118 Mo. App. 280; Ulrey v. Ulrey, 80 Mo. App. 48.]

Judgment reversed and cause remanded with directions to the trial court to set aside its judgment dismissing plaintiff's cause of action, to enter a decree divorcing her from her husband and to allow her such alimony as the court may deem just and proper. All concur.